# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LONNIE JACKSON, and                            No. 16-CR-2362-WJ
DIAMOND COLEMAN,                             No. 16-CR-2363-WJ

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART THE
## UNITED STATES' MOTION TO RECONSIDER[1]

THIS MATTER comes before the Court following a hearing on the United States' Sealed

Motion to Reconsider **(Doc. 88, filed 4/30/18, see Footnote 4)**. Having reviewed the pleadings,

heard the arguments of counsel, and considered the applicable law, the Court has determined that

the Government's Motion is well-taken, and is therefore is **GRANTED IN PART** to the extent

that the Court finds it was legal error for the former presiding judge to order discovery on the

selective enforcement claim, but the Motion is **DENIED IN PART** in that the Court will not

conduct a new evidentiary hearing on the selective enforcement claim. The Government's

Motion is further **GRANTED IN PART** in that the Court finds that the Government has

complied to the fullest extent possible with the discovery ordered by the former presiding judge

regarding the selective enforcement claim.

---

[1]     Per the Sealed Telephonic Status Conference (Doc. 122) on September 18, 2018, the Court informed counsel for the Government and for Defendants Jackson and Coleman that this *Memorandum Opinion and Order* would be filed under seal for a period of ten (10) days while counsel determine what, if anything, needs to be redacted before this *Memorandum Opinion and Order* is made available for public viewing. The Court will issue a separate Order to Show Cause addressing the unsealing of this document.

## STATEMENT OF THE CASE

Before the Court is the Government's Sealed Motion to Reconsider (Doc. 89) the *Memorandum Opinion and Order* by U.S. District Judge M. Christina Armijo (Doc. 73).[2] In that opinion, Judge Armijo granted certain discovery requests by Defendants that they assert would supply evidence to support their selective enforcement defense. In response to the issues raised by both parties at the status conference on April 9, 2018, the Court directed the Government to file the present *Motion to Reconsider* so the Court could comprehensively examine the underlying facts and the issues arising out of the discovery order. Docs. 87, 91.

The selective enforcement claim is an Equal Protection challenge alleging that law enforcement officials selectively investigated or arrested defendants because of their race. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). A selective enforcement defense requires that a defendant show a discriminatory intent by law enforcement and a discriminatory effect, in that similarly-situated individuals were not investigated or arrested based on race. *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001). If successfully asserted, it is not a defense based on innocence, but a complete defense that undermines the constitutionality of a defendant's prosecution to the extent that dismissal of the indictment(s) may be required. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir. 2006). Before reaching the merits of the selective enforcement claim, a defendant is entitled to discovery material from the prosecution if he or she makes a threshold showing of "some evidence" of both discriminatory effect and discriminatory intent. *Alcaraz-Arellano*, 441 F.3d at 1264 (citing *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).

---

[2] Judge Armijo's status as an active district judge in regular service changed to a senior district judge effective February 7, 2018, the same day she issued the *Memorandum Opinion and Order* (Doc. 73). Thereafter, Judge Armijo recused herself as the presiding judge over the two above-captioned cases and they were randomly reassigned to the undersigned district judge. Doc. 75.

This Court must determine whether discovery, even the limited discovery allowed here, was granted in error based on the total record developed in these cases. The Court must also decide if these two Defendants are entitled to more discovery materials from the Government or if the Government has complied with the discovery ordered by Judge Armijo. At this stage, the Court is not ruling on the final merits of the selective enforcement defense, but the Court must, to a lesser extent, examine whether the record establishes "some evidence" of discriminatory intent and discriminatory effect sufficient to support the discovery order.

## BACKGROUND

In the summer of 2016, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") conducted a four-month undercover operation in Albuquerque, known as the "Surge," that resulted in the arrests of 104 defendants who were charged in federal court.[3] Doc. 73 at 2. The ATF Surge cases were assigned randomly among the district judges in the District of New Mexico. Twenty-eight of the ATF Surge defendants are African American, twelve are white, and sixty-four are Hispanic. Doc. 73 at 2. Defendants Jackson and Coleman are both African American, and their cases have been consolidated solely for the purpose of raising this selective enforcement defense. Doc. 73 at 1 n1. Lonnie Jackson ("Jackson") is charged with distributing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Doc. 2362:2.[4] Diamond Coleman ("Coleman") is charged with multiple counts of distributing methamphetamine, using and carrying a firearm during and in relation to a drug trafficking crime, and being a felon in

---

[3]     There was a dispute on the record about whether there were 103 or 104 defendants arrested in the Surge. The *Memorandum Opinion and Order* indicates Judge Armijo found there were 104 defendants arrested, so the Court will accept this number. Doc. 73 at 2.

[4]     This *Memorandum Opinion and Order* references the docket numbers for 16-CR-2362 because the filings in these cases were previously consolidated for the purpose of the selective enforcement claim and these two defendants have filed almost identical motions in their individual cases. Jackson and Coleman are collectively referred to as "Defendants" and both are represented by the Albuquerque Office of the Federal Public Defender.

possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and (c), and 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and (C). Doc. 2363:3.

Many of the Surge cases have already concluded; however, in addition to Defendants Jackson and Coleman, there are two other defendants in two separate cases who have raised selective enforcement claims. The first case is *United States v. Laneham*, No.16-cr-2930-JB, 2017 U.S. Dist. LEXIS 176486, pending before U.S. District Judge James O. Browning, and the second case is *United States v. Casanova*, No. 16-cr-2917-JAP, pending before Senior U.S. District Judge James A. Parker. In the *Laneham* case, Judge Browning ruled against Defendant Laneham on his request for discovery, finding that he failed to meet the required evidentiary burden in order to obtain the discovery he requested. 2017 U.S. Dist. LEXIS 176486. In the *Casanova* case, Judge Parker granted Defendant Casanova's discovery request in part and, after ordering the parties to confer and resolve discovery disputes, ruled that the United States must produce the NCIC reports created or obtained by ATF Agent Russell Johnson if those reports were "within the possession, custody, or control of the government." 16-CR-2917, Doc. 83 (Dec. 13, 2017). Counsel for Defendant Casanova has since filed a *Motion to Dismiss Because of Selective Enforcement of the Criminal Law* (Doc. 102), and a hearing on that motion is pending before Judge Parker.

Most of the litigation in the two cases involving Defendants Jackson and Coleman has revolved around *Defendant's Motion to Compel Discovery Pertaining to Claim of Selective Enforcement*, Doc. 29 (filed 4/19/17), and *Defendant's Supplement to his Motion to Compel Discovery*, Doc. 45 (filed 9/21/17), in which Defendants requested discovery items for their selective enforcement claims. After the initial request, Defendants and the Government reached a resolution as to some of the discovery items requested, and then Defendants filed the supplement

to their discovery motion for the remaining items. Doc. 45, filed 9/21/17; Government Response, Doc. 47, filed 10/5/17. To determine whether Defendants Jackson and Coleman had made the proper showing to obtain these discovery items, an extensive evidentiary hearing was held in front of Judge Armijo on October 30, 2017, and December 13, 2017, during which the Government presented the testimony of two key ATF agents. Agents Russell Johnson and Richard Zayas testified about their roles in the ATF Surge in Albuquerque. The Government entered fifty-nine exhibits on the record (Ex. 1–56, 57, 59, 60), and Defendants entered sixteen exhibits (Ex. A–O, R).

In the *Memorandum Opinion and Order* (Doc. 73, filed 2/7/18), Judge Armijo granted defendants' discovery requests for Defendants' items numbered 1 and 3:

> 1) The [National Crime Information Center (NCIC)] criminal history report relied on by the ATF during the investigation of the member of the Albuquerque ATF surge defendant class, in each of the 103 Albuquerque ATF surge cases.
>
> 3) All NCIC criminal reports requested or generated, related to the Albuquerque ATF Surge, by any law enforcement officer working on the Albuquerque ATF Surge, between March 1, 2016 and September 30, 2016.

Doc. 73 at 3, 4, 26. After the undersigned judge was randomly assigned these two cases, the United States filed a *Notice of Inability to Supply Further Discovery* (Docs. 80, 81) on March 18 and 20, 2018, in which the Government indicated that it had complied with Judge Armijo's discovery order.

During the status conference on April 9, 2018 (Doc. 87), at which both Defendants Jackson and Coleman were present, the Court heard limited argument on the discovery dispute. Defendants maintained that the Government had not produced discovery to the extent ordered by Judge Armijo, while the Government asserted that it had complied and it could not produce more discovery. At that time, the Court resolved the remaining issues with the unsealing of certain

exhibits for public viewing, but the Court was unable to resolve the discovery dispute without more information from the parties. Given that the two above-captioned cases had been randomly reassigned as a result of Judge Armijo's recusal and considering the undersigned judge's unfamiliarity with the record in these two cases, the Government was ordered to file a motion to reconsider, with Defendants Jackson and Coleman having the opportunity to respond in accordance with the local rules of this District. The Court set a briefing schedule for the parties (Doc. 88) and struck the Government's *Notice of Inability to Supply Further Discovery* (Docs. 80, 81, 86) from the record.

The Government filed the instant *Sealed Motion to Reconsider* on April 30, 2018 (Doc. 89), to which Defendants filed their joint response on June 25, 2018 (Doc. 97) and the Government submitted its sealed reply brief on July 13, 2018 (Doc. 101). The Court heard oral arguments from the Government and both Defendants regarding the *Motion to Reconsider* at the hearing on August 3, 2018. Doc. 108, Clerk's Minutes; Doc. 118, Transcript of Proceedings. The Government contends that Judge Armijo erred in granting discovery, and further, that it has complied with the discovery order and the production of the remaining discovery materials Defendants demand is unduly burdensome. Defendants argue that Judge Armijo did not err in granting discovery and that the Government is obligated to produce more materials under the discovery order, which Defendants contend is not unduly burdensome.

First, the Court reviews the law for selective enforcement claims and the record that was in front of Judge Armijo in order to address whether Judge Armijo committed legal error in granting discovery. Second, the Court examines the discovery dispute and its proper resolution.

## DISCUSSION

## I. Legal authorities

### A. Selective enforcement defense elements and discovery standards

A decision to prosecute or enforce the law that is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification is a denial of equal protection." *United States v. DeBerry*, 430 F.3d 1294, 1299 (10th Cir. 2005) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)) (quotation marks omitted). The Equal Protection Clause thus provides different constitutional protection from law enforcement and government conduct than the protections of the Fourth Amendment. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F. 3d. 1157, 1166 (10th Cir. 2003) ("[T]he right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment."); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level[,]"and was "one of the central evils addressed by the framers of the Fourteenth Amendment." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263 (10th Cir. 2006) (quoting *Marshall*, 345 F.3d at 1167). As the Tenth Circuit has explained, "[t]he ban on discriminatory prosecution is not limited to the states but also applies to the federal government under the Fifth Amendment's Due Process Clause." *DeBerry*, 430 F.3d at 1299 (citing *Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985)).

A defense grounded in "a claim of racially selective law enforcement draw[s] on what the Supreme Court has called 'ordinary equal protection standards.'" *Marshall*, 345 F. 3d. at 1168 (citation and quotation marks omitted)). To succeed on a claim of racially selective enforcement or prosecution, a defendant "must establish two elements: [1] the federal . . . policy had a discriminatory effect and [2] it was motivated by a discriminatory purpose." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting *United States v. Armstrong*,

517 U.S. 456, 465 (1996) (establishing the requirements for selective prosecution defense)). The Tenth Circuit has ruled that "[t]he elements are essentially the same" for a selective prosecution defense as for a selective enforcement defense, "which challenges the decision[s] and actions of the law enforcement officer[s], not the exercise of discretion by the prosecutor." *Id.* at 1262, 1264. As the Supreme Court of the United States explained the framework for selective prosecution in *United States v. Armstrong*, 517 U.S. 456 (1996), this "claim is not a defense on the merits to the criminal charge itself, but an independent assertion" that the defendant was stopped or arrested "for reasons forbidden by the Constitution." 517 U.S. at 463. A successful selective enforcement defense therefore is a "complete defense" in the sense of a challenge that undermines the constitutional integrity of a defendant's charge so extensively that dismissal of the indictment may be the appropriate remedy. *See Schwartz v. N.M. Corr. Dep't Prob. & Parole*, 384 F. App'x 726, 730 (10th Cir. 2010) ("Selective prosecution is generally a complete defense to a criminal charge." (citing *Kramer v. Village of N. Fond du Lac*, 384 F.3d 856, 862 (7th Cir. 2004) ("Selective prosecution and entrapment are complete defenses to a crime. If [a defendant] had successfully asserted either one of them at his trial, [he] would not have been convicted."))); *accord Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding a violation of the Fourteenth Amendment in the application of the law to petitioners and ruling that "[t]he imprisonment of the petitioners is, therefore, illegal, and they must be discharged").

The standard of proof for selective prosecution and selective enforcement claims must be "demanding" because of the burden that judicial interference with law enforcement imposes upon the justice system as a whole. *Alcarez-Arellano*, 441 F.3d at 1264; *Armstrong*, 517 U.S. at 465 (stating the demanding standard "stems from a concern not to unnecessarily impair the performance of a core executive constitutional function"). Even procuring discovery for a claim

of selective prosecution and enforcement places a large burden on the Government "to assemble from its own files documents which might corroborate or refute the defendant's claim." *Armstrong*, 517 U.S. at 468. The Supreme Court explained that "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement . . . and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465 (citation omitted). Additionally, "[c]harges of racial discrimination . . . may be easy to make and difficult to disprove." *Marshall*, 345 F.3d at 1167. Another relevant consideration is that imposing judicial oversight upon law enforcement actions may "induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws, such as by directing law-enforcement resources away from minority neighborhoods." *Alcarez-Arellano*, 441 F.3d at 1264 (citing *Marshall*, 345 F.3d at 1167). Thus, "the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'" *Id.* (citing *Marshall*, 345 F.3d at 1167, and *Armstrong*, 517 US. at 463).

To satisfy the "discriminatory purpose" prong, a defendant must show "that discriminatory intent was a motivating factor in the decision to enforce the criminal law against the defendant." *Alcaraz-Arellano*, 441 F.3d at 1264. Discriminatory intent does not have to be the sole motivating purpose, but such intent must have been "a motivating factor in the decision . . . ." *Marshall*, 345 F.3d at 1168. Discriminatory purpose is not only the effect on the defendant, as it "implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (citation omitted). Discriminatory intent may be proven through

direct or circumstantial evidence. *Alcarez-Arellano*, 441 F.3d at 1264. Although the Tenth Circuit has stated that "[s]tatistical evidence can be used to show both discriminatory effect and discriminatory purpose[,]" *Blackwell v. Strain*, 496 F. App'x 836, 839–40 (10th Cir. 2012) (citing *Marshall*, 345 F.3d at 1168), the Supreme Court has acknowledged that "statistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution, . . . ." *McCleskey v. Kemp*, 481 U.S. 279, 293–94 (1987) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)) (rejecting argument that statistical analysis demonstrated discriminatory purpose and upholding constitutionality of Georgia death sentencing process).

Regarding the "discriminatory effect" requirement, when a defendant's selective enforcement "claim is based on the investigative phase of the prosecution, . . . the defendant must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred." *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001). The defendant may satisfy this requirement "by identifying a similarly-situated individual or through the use of statistical evidence." *Id.* When a defendant uses statistical evidence to show a discriminatory effect, the statistical evidence should "include (1) reliable demographic information, (2) some manner of determining whether the data represents similarly situated individuals, and (3) information about the actual rate of occurrence of the suspected crime across relevant racial groups." *United States v. Alabi*, 597 F. App'x 991, 997 (10th Cir. 2015) (citing *Marshall*, 345 F.3d at 1168). In the context of selective prosecution, the Tenth Circuit adopted the Fourth Circuit's formulation that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different

prosecutorial decisions with respect to them." *DeBerry*, 430 F.3d at 1301 (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)). In the investigative phase of an operation, therefore, defendants are similarly situated when their circumstances provide no "distinguishable legitimate" factors that might justify enforcing the law differently upon each of them. *Accord United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (applying *Olvis* definition of "similarly situated" to selective enforcement and providing definition as: "their circumstances present no distinguishable legitimate [enforcement] factors that might justify making different [enforcement] decisions with respect to them"); *see also United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012) (providing factors the district court should examine when determining whether individuals are similarly situated in selective prosecution case).

As the United States Supreme Court explained in *Armstrong*, the "justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." 517 U.S. at 468. Echoing the Supreme Court's purposefully high discovery standards for selective prosecution, the Tenth Circuit adopted the *Armstrong* standard outright for discovery in a selective enforcement action in *Alcarez-Arellano*. 441 F.3d at 1264. Under the Tenth Circuit standard, a defendant seeking discovery for a selective enforcement defense must "produce 'some evidence' of both discriminatory effect and discriminatory intent." *Id.* (citing *Armstrong*, 517 U.S. at 468) (stating "[i]n *James* we applied this standard to a claim of selective enforcement" (citing 257 F.3d at 1178–81)). In *Armstrong*, the Supreme Court noted the "some evidence" standard required for discovery was also described by appellate courts as a "'colorable basis,' 'substantial threshold showing,', 'substantial and concrete basis,' or 'reasonable likelihood[.]'" 517 U.S. at 468. Therefore, "[a]lthough defendants seeking discovery need not establish a prima facie case

of selective prosecution, they must satisfy a 'rigorous standard.'" *Alcarez-Arellano*, 441 F.3d at 1264 (citing *Armstrong*, 517 U.S. at 468). In *Armstrong*, the Supreme Court stated that despite the Court of Appeals' "concern about the evidentiary obstacles defendants face . . . . the required threshold . . . adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." 517 U.S. at 470. The Tenth Circuit has explained that "[f]or similar reasons discovery is limited[]" and discovery must "itself be a significant barrier to the litigation of insubstantial claims." *Alcarez-Arellano*, 441 F.3d at 1264 (citing *James*, 257 F.3d at 1178).

### B.      Pretrial defense motions

Federal Rule of Criminal Procedure 12(b) provides that a defense "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . [including] a defect in instituting the prosecution, including selective or vindictive prosecution." Fed. R. Crim. P. 12(b)(3)(a)(iv). The Tenth Circuit has explained that "[c]hallenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence. Rather, [a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (internal citations omitted). Therefore, in deciding whether Defendants should receive discovery to support their selective enforcement defense, this Court treats the proffered facts as true. This treatment, however, does not constitute fact-finding that binds this Court, the parties, or a jury outside of the issue of whether Defendants are entitled to discovery on the selective enforcement defense under Judge Armijo's *Memorandum Opinion and Order* (Doc. 73). Furthermore, the

Court's treatment of the allegations against Defendants as true for the purpose of ruling on the discovery issue has no effect on the presumption of Defendants' innocence.

### C.     Standard for reconsideration of an interlocutory order

Although the Federal Rules of Criminal Procedure do not specifically provide for motions to reconsider, the Tenth Circuit has ruled that a district court may properly grant such a motion in a criminal case. *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) (citation omitted) (applying law of the case grounds to motion to reconsider suppression ruling). The Tenth Circuit has provided that "[t]he law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (quotation and citation marks omitted). Defendants rely on the tenet that "[w]hen law of the case doctrine applies, three circumstances generally warrant departure from the prior ruling: (1) new and different evidence; (2) intervening controlling authority; or (3) a clearly erroneous prior decision which would work a manifest injustice." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011). Defendants maintain that none of these three circumstances are present and that the Court must deny the Government's *Motion to Reconsider*.

The Government contends that the law of the case doctrine is not binding here, and the Court agrees that the "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." *Id.* at 1252; *see United States v. Johnson*, 12 F.3d 1540, 1544 (10th Cir. 1993) (applying this principle in criminal case). Thus, "district courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007) (providing that "the rule is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is

one of efficiency, not restraint of judicial power" (internal citation omitted)). In *Rimbert*, the Circuit outright rejected the proposition that the "doctrine of law of the case should apply to constrain a successive district judge's ability to revisit discretionary, interlocutory decisions made by prior judges." 647 F.3d at 1251. Considering the transfer of a case before the entry of a final judgment, "the [law of the case] doctrine does not bind a judge to following rulings in the same case by another judge of coordinate jurisdiction as long as prejudice does not ensue to the party seeking the benefit of the doctrine." *Id.* (quoting *Johnson*, 12 F.3d at 1544 (applying to criminal case)). Even then, "[t]he relevant prejudice is limited to lack of sufficient notice that one judge is revisiting the decision of a prior judge and the opportunity to be heard with respect to the new ruling." *Id.* As the Circuit further commented in *Rimbert*, which reconsidered a *Daubert* ruling, "it was not manifestly unreasonable for the district court to, upon being assigned a new case, independently assure itself of the expert's reliability and to fulfill its gatekeeper function." *Id.* at 1253.

In this case, the discovery order constitutes an interlocutory order. *Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1227 (10th Cir. 2001) (explaining that a final order "ends litigation on the merits and leaves nothing for the district court to do but execute the judgment . . . . Discovery orders generally are interlocutory and not immediately appealable"); *see also Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge." (quotation omitted)). The parties clearly had notice that this Court is reconsidering Judge Armijo's Discovery Order, as the Court informed the parties of as much on the record at the status conference (Doc. 87), the parties briefed these issues for the Court (Docs. 89, 97, 101), and the parties all argued these issues on the record at the August 3, 2018 hearing (Doc. 108). Therefore, there is no reason that

this Court cannot reconsider the interlocutory discovery order issued by Judge Armijo in her *Memorandum Opinion and Order*, as this Court is not bound to only the three grounds for reconsideration under the law of the case doctrine and there is no prejudice to the parties for lack of notice. Additionally, if the law of the case doctrine were binding upon the Court here, this is an instance in which reconsideration would be proper because "a clearly erroneous prior decision . . . would work a manifest injustice[,]" *Rimbert*, 647 F.3d at 1251, as this Court finds that Judge Armijo clearly erred in her prior decision granting discovery, which continues to work an injustice upon the Government through the unmanageable burden of continuing to provide discovery.

## II.    Summary of evidence and legal application

For the Government's *Motion to Reconsider*, the Court will review factual findings and legal conclusions in the *Memorandum Opinion and Order* by Judge Armijo (Doc. 73). The Court looks to the factual recitation by Judge Armijo, and where that recitation is inadequate or ambiguous, the Court has independently consulted the record. The Court finds no reason that the existing record is insufficient. As one of the issues within the Motion to Reconsider is whether the Court should re-conduct the evidentiary hearing and make new factual findings, it would be premature for the Court to set aside the facts as Judge Armijo determined them and as the record reflects before analyzing the issues by referencing the current record.

### A.    Discriminatory intent

Defendants relied on three theories to show discriminatory intent, none of which were sufficient to show that ATF possessed a discriminatory purpose in investigating or arresting the Surge defendants. Defendants presented evidence on three theories: the social theory of homophily; the "prior misconduct" by some of the agents involved in this operation; and ATF's

decision to target the southeast quadrant of the city. The Court agrees that Defendants failed to demonstrate discriminatory intent.

### 1. Homophily

There was an evidentiary hearing in front of Judge Armijo on October 30, 2017, and December 13, 2017, at which time the Government put numerous Reports of Investigation on the record (Government's Exhibits 1–56) about individuals investigated and arrested in the Surge. Tr. 10/30/17, 57:13–14; *see also* Government's Exhibit 59 (summary of Exhibits 1–56; Tr. 10/30/17, 61:24). Regarding the selection of the confidential informants (CIs), Special Agent Russell Johnson, one of the two lead case agents in the operation, testified that ATF enlisted three black CIs and two Hispanic CIs. Tr. 10/30/17, 28:17–19. Agent Johnson stated that there were no white confidential informants available for the operation. Tr. 12/13/17, 244:12–15. He also testified that he selected CIs who had experience with this kind of operation, and they were CIs that the ATF had worked with in the past from various locations in the United States. Tr. 10/30/17, 28:25–29:1; *see also* Tr. 12/13/17 243:19–244:25.

In determining whether to target an individual by initiating investigation, Agent Johnson testified

> [t]here was not an official decision-making process. We'd look at the information that the CIs would provide. What is this particular individual involved in? Is it firearms? Is it narcotics? We'd look at criminal history; outside factors; talk to local police officers that we worked with as a part of the operation. So there wasn't a hard set, okay, this is the criteria, you've got to check these boxes. It was all on a case-by-case basis, depending on the information we received.

Tr. 10/30/17, 29:2–15. Agent Johnson also provided as follows:

> Q. Were there targets who were not known to ATF initially, who surfaced during the operation?
> A. Yes. There was a lot of targets. You know, the confidential informants might meet a guy who said, "I have guns or narcotics," and then a deal might not ever materialize. There were guys, you know, not to use "come and go," but guys that

would pop up just randomly one day, that the CI ran into. So fluid is a very good way to describe the day-to-day operations. There wasn't a hard set plan on any given day.

Q. And I believe you testified to this before, but was the criteria, essentially criminal history criteria, was that set in stone?

A. No.

Tr. 10/30/17, 29:24–30:12; *see* Tr. 10/30/17, 52:21–23 ("Q. Now, in terms of ATF's criteria for selecting targets, was race any part of that criteria? A. No."). On cross-examination, Agent Johnson testified:

Q. And then you would make a decision if that person was what you—I'm going to use the term that you've used in the past—"a righteous target"?

A. Yes.

Q. And what do you mean by "a righteous target"?

A. Somebody that we want to pursue further, to see if they're involved in the activity that they told the CI they're actually involved in.

Q. And you base that on their criminal history?

A. Whether it's the criminal history; what our local or state or federal counterparts know about the individual or the area; if it's a specific neighborhood and there's an individual with that same moniker that supposedly is involved in different things. It was a case-by-case basis.

Q. And at that point, you would decide if someone was worth pursuing or not, correct?

A. If we wanted to possibly attempt to arrange a transaction.

Tr. 10/30/17, 98:6–24. Agent Johnson clarified:

But when I say "a righteous target," when we decide to start a case with an individual, we start somewhere. We started with Diamond Coleman. We started with Lonnie Jackson. We started with Yusef Casanova. If they bring somebody else into the picture, you know, that's not on us. And earlier testimony regarding conspiracies, if they bring in Eulalio Rangel or somebody else who has a criminal history that's lighter than theirs, we didn't choose for that person to show up. So when we're talking about why we pursued certain individuals, it's when we initiated a case.

Tr. 10/30/17, 100:6–16.

Agent Johnson characterized the interactions in which the CI met one individual, who then introduced the CI and the undercover agent to another contact who provided the agent with firearms or drugs, as "conspiracies." Tr. 10/30/17, 20:30–31:5; 31:17–19 (describing conspiracies as "two or more people engaged in criminal activity together that we ultimately charged," but not necessarily charged as a conspiracy). Twenty-seven of the Surge defendants were "stand alone" defendants, and the rest of Surge defendants were associated with a "conspiracy." Tr. 10/30/17, 49:6–10. The Court admitted Exhibit 57, which is a comprehensive summary composed by Agent Johnson of the "conspiracies" that came out of individual meetings. Tr. 10/30/17, 31:15–43:15. There were twenty-six "conspiracies" in the Surge operation. Tr. 10/30/17, 30:22–25. Agent Johnson testified as follows:

> Q. And so explain to me how the CI process works in the context of how the CIs operated in terms of identifying targets and then potentially identifying other targets based on the initial targets.
> A. We would interview or debrief the CIs on a daily basis, myself and other agents. The CIs would provide us the information regarding an individual they met. We saw at least 26 times throughout the operation, based on there being at least 26 multi-defendant cases, where the CI would meet one individual. We, as undercovers, would meet with that individual. That individual would then introduce us to other people. And so a lot of the cases involved started with one particular target, and then based on the target's actions, he would bring other targets into the operations.

Tr. 10/30/17, 30:16–31:5. Thus, ATF conducted transactions with initial targets, but agents also conducted transactions with other individuals that the initial target brought into the operation.

Agent Johnson testified:

> The conspiracies are determined by the targets, and we have no control over that, and we don't worry about, you know, who they're going to bring, as long as individuals they bring—you know, they're supposed to bring narcotics. If they bring that, then we pursue.

Tr. 10/30/17, 51:21–25. He explained further:

The defendants make the decision on who they bring to transactions or who they choose to associate with for illegal activity. We don't make that choice for them. We don't tell them who to bring. They bring individuals that they associate with for whatever reason they choose.

Tr. 10/30/17, 52:13–17.

Regarding the purpose of the operation, Agent Johnson testified:

Q. And you were to go out and get people who you considered to be violent criminals, correct?
A. Involved in illegal activity, to include firearms trafficking, narcotics trafficking, which led to and was a part of the violence in this city.

Tr. 10/30/17, 102:13–17. Agent Johnson also testified:

Q. Did you have any policies or statements or summaries of how you and ATF, as part of this enhanced enforcement initiative, define the term "violent criminal"?
A. No. As I testified earlier, there was not a set in stone checklist.

Tr. 10/30/17, 96:22–97:1. When asked whether the CIs were "trained in avoiding implicit bias",

Agent Johnson responded

[t]hey were trained in meeting individuals and trying to find out if they're involved in illegal activity. We would take the information they would receive from the streets and try to corroborate that through, whether it's criminal history, other law enforcement contacts, or an undercover meeting where the individual, if they said they sell drugs or sell guns, we corroborate it by them—doing a deal with them, where they sell us a gun or sell us narcotics.

Tr. 10/30/17, 92:13–21. Agent Johnson further testified on cross that

Q. So what training did you give the CIs about Albuquerque and the area of the southeast quadrant, what you described as the southeast quadrant, about where they should go within that area?
A. There was no training.
Q. There was no training? They were to go out and, on their own wiles, look and find violent crime?
A. Yes.

Tr. 10/30/17, 93:22–94:4. When asked whether he had ever received training on implicit bias,

Agent Johnson testified:

Q. What is your understanding of implicit bias?

A. Just any sort of bias towards another group.

Q. What does "implicit" mean to you, versus "explicit"? Does that help?

A. I mean, you have to give me context.

Q. All right. If I told you the definition might be something like: Implicit bias refers to the attitudes or stereotypes that affect our understanding, our actions, our decisions in an unconscious manner. So "implicit" means something that's under the surface, that we may not even recognize as being present. Does that help you understand the notion of implicit bias?

A. Have I ever had or received training for implicit bias? No.

Q. Okay. You never have. And that's not something they give law enforcement officers, to your knowledge?

A. To see what's underneath the surface?

Q. Well, to help you recognize that perhaps you or I or anybody in this courtroom might carry prejudicial attitudes, acting on prejudices, biases, stereotypes. You've never had any training in that whatsoever?

A. In regard to the fact that we possibly could have these things underlying, no.

Tr. 12/13/17, 252:2–24.

Agent Richard Zayas also testified about his role in selecting the agents, which was a process that allowed Agent Zayas to question the agents about their CIs. Tr. 12/13/17, 308:5–17. As Agent Zayas described the process,

> I do the selection of the agents, so while I'm selecting the agents and I'm talking to individuals around the country, I'm trying to determine what confidential informants are available and then the reliability of those confidential informants. So as I'm seeking agents and I'm trying to obtain different agents to come to Albuquerque based upon their experience and their ability to work with others and all that type of thing, I'm also questioning the agents throughout the country as to their confidential informants and if those confidential informants are reliable.

Tr. 12/13/17, 308:4–14.[5] When asked about the selection of the CIs, Agent Zayas stated that "[f]or the most part, I don't even ask what their race is. It doesn't matter." 12/13/17, 310:7–8. He testified that the selection of the CIs is "just whoever happens to be available at that time that I'm

---

[5]     The Court interprets this testimony to mean that, while interviewing agents to participate in the Albuquerque Surge, Agent Zayas also asked these agents about their recommendations for CIs for the operation in Albuquerque.

able to vet, that the information comes back to me that these people are reliable." Tr. 12/13/17, 310:2–6. Agent Zayas stated that he was not provided with information about the composition of the Albuquerque community regarding ethnic or racial composition when he was recruiting agents and CIs. Tr. 12/13/17, 309:13–22. Agent Zayas testified that the targets of the Surge "would have been individuals engaged in narcotics trafficking, firearms trafficking." Tr. 12/13/17, 289:8–10. The "Executive Summary Report" (Exhibit R), which Agent Zayas testified he took part in preparing, provides, "The focus of this concentrated initiative involved the infiltration by undercover agents of established firearms and/or narcotics tracking organizations facilitated by Mexican-based drug trafficking organizations." Tr. 12/13/17, 291:9–13. When examined about the criteria for selecting targets to investigate, Agent Zayas testified as follows:

> Q. Now, when you were in the planning stages of this operation, was there criteria that you used to determine who would be a potential target?
> A. No.
> Q. Other than this phrase here, "facilitated by" Mexican drug DTOs?[6]
> A. Each individual was viewed upon the circumstances of that particular individual.
> Q. All right. There is no written guidelines on how to pursue an individual or not pursue an individual?
> A. No, sir.
> Q. There was nothing concerning minimum quantities of drugs or anything like that?
> A. No, sir.
> Q. Or based on that individual's criminal history, was there any criteria used to determine if that individual would be pursued or not?
> A. No, sir. It was based on totality of the circumstances, of the information.

Tr. 12/13/17, 293:22–294:15. When asked about implicit or explicit bias, Agent Zayas testified to the effect that he has never received implicit bias training. Tr. 12/13/17, 299:18–301:2. In response to criticism that the Chicago stash house cases had brought in "an excessively large number of minorities," Agent Zayas responded "we're colorblind, we're race blind. As the information comes in to us, we evaluate that information. For us to bring race into the matter

---

[6] Counsel was referencing Exhibit R; "DTO" means drug-trafficking organization. Tr. 12/13/7, 291:9–13.

would mean that we would ignore information that's being brought to us. So we're race neutral."

Tr. 12/13/17, 301:11–15. He further testified:

> Q. So what about this criticism, that if you're race neutral, you came into Albuquerque with five CIs, three of whom are Black and two of whom are Hispanic, all minorities, and 60 percent of whom were Black? Does that cause you to reflect like: How we set this operation up may have caused the results to be different?
>
> A. No. Throughout my career, I have worked investigations on all races, so I don't feel that bringing in a particular race is going to subject us to working a particular race. When you work on the street, it's basically the color of money. Race doesn't apply. So if you have the money and the other individual has the drugs or guns, then the transaction is committed. I think you're bringing race into a situation that doesn't exist.
>
> Q. Well, that might be, but let me ask it again, that by front-loading your CI class with a majority of African Americans, I guess your answer is: That won't change or it doesn't make a difference on who the ultimate arrestees are, the people who get arrested are?
>
> A. That's correct.
>
> Q. Just because a confidential informant is Black, for example, doesn't mean that he or she will have greater entree into the Black community?
>
> A. No. He or she is going to meet individuals that are engaged in criminal activity, and they're going to bring us back that information.

Tr. 12/13/17, 301:16–302:22 (objection omitted at 301:22–302:2).

Defendants assert that the selection of three black CIs "prefigures the selection of defendants and, in this foreshadowing, manifests the existence of selective enforcement." Doc. 29 at 23. Defendants rely heavily on the theory of homophily, which is a social theory of "intra-group affinity" (Doc. 29 at 23), meaning that "contact between similar people occurs at a higher rate than among dissimilar people." Doc. 73 at 13 (citing Miller McPherson, Lynn Smith-Lovin, and James M. Cook, *Birds of a Feather: Homophily in Social Networks*, Annu. Rev. Sociol. 2001 27:514–44, available at http://aris.ss.uci.edu/~lin/52.pdf (last visited Aug. 14, 2018) (hereinafter *Birds of a Feather*). Judge Armijo summarized Defendants' argument as being that "ATF recruited black confidential informants when they knew or should have known that black

confidential informants would interact with more black drug or firearms dealers than with dealers of other races." Doc. 73 at 13. Defendants maintain that "for every Black 'principal' a confidential informant targeted, a web of several Black codefendants was often spun[,]" Doc. 29 at 24, and that under the theory of homophily, the ATF's selection of three black CIs demonstrates a discriminatory purpose on the basis of race. Doc. 29 at 23 ("That a group of confidential informants, the majority of whom were Black, interacted with, developed relationships with, and ultimately targeted Black men in Albuquerque, is exactly what a sociologist, or anyone with common sense, and especially law enforcement, who presumably have experience with the use of confidential informants, would expect to happen.").

Judge Armijo relied on the numbers in Exhibit 57, which she determined reflect that "[o]f the twenty-six cases involving multiple suspects, fifteen involved a black confidential informant. Of these fifteen instances, seven involved one or more black suspects. At the same time, only two of the eleven multiple suspect cases involving non-black confidential informants involved black suspects." Doc. 73 at 17. She found that "[t]aken together, both Agent Johnson's testimony and the figures in Government's Exhibit 57 support Defendants' homophily theory. Nevertheless, even if the ATF knew of the potential impact of such preferences, this evidence is insufficient on its own to show that the ATF purposefully selected black confidential informants so as to target black people in Albuquerque." Doc. 73 at 17. Judge Armijo cited to the Supreme Court's ruling in *Wayte v. United States*, 470 U.S. 598 (1985), for the proposition that "[d]iscriminatory purpose . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 470 U.S. at 610. Notably, Judge Armijo did not expressly find that this evidence satisfied even the

lower discovery standard of "some evidence." *See Defendant's Response to Government's Motion to Reconsider*, Doc. 97 at 18 (noting that Judge Armijo "did not explicitly state that [she] found 'some evidence' of discriminatory intent and effect").

This Court cannot agree that, even if taken as true, evidence of homophily could support a finding of discriminatory intent by ATF agents in these circumstances. As the Supreme Court has explained, discriminatory purpose implies that the decision-maker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) and *Wayte*, 470 U.S. at 608–09) (rejecting defendant's claim that Georgia applied the death penalty statute against African Americans in violation of the Fourteenth Amendment). In *McCleskey v. Kemp*, the Supreme Court stated that "[f]or this claim to prevail, McCleskey would have to prove that the Georgia Legislature enacted or maintained the death penalty statute *because of* an anticipated racially discriminatory effect." *Id.* Similarly, the Supreme Court denied a Fourteenth Amendment claim that a state veterans' preference statute discriminated against women because "nothing in the record demonstrates that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Supreme Court has consistently ruled that a showing of discriminatory purpose for an Equal Protection claim requires proof that the action was *intended* to cause adverse effects upon a group. *See, e.g.*, *Wayte*, 470 U.S. at 610 ("Even if the passive policy had a discriminatory effect, petitioner has not shown that the Government intended such a result . . . . Absent such a showing, his claim of selective prosecution fails.").

Defendants' evidence on the theory of homophily fails to credibly show "some evidence" that ATF selected three African American CIs to intentionally adversely affect the African American community in Albuquerque. Homophily is "a basic organizing principle" (*Birds of a Feather* at 416) that stands for the proposition that individuals demonstrate an affinity for contact with other individuals with whom they share characteristics, including race and ethnicity, but also including other characteristics: gender, age, education, religion, occupation, social class, behavior, and values (*id.* at 429), all of which are related to a number of factors: geography, family ties, and school/work/voluntary organizational foci. *Id.* at 429–31. Thus, homophily represents a theory of individual connections through social networks and, at most, it could show that the African American CIs had an affinity to approach others who were similar to them, but Defendants lack even some evidence that this was *an adverse effect that ATF intended for African Americans in the Surge*. *See id.* at 418 ("There are some subtle differences . . . but in general the patterns of homophily are remarkably robust over these widely varying types of relations.").

Additionally, the testimony cited above from Agent Johnson and Agent Zayas reflects that the agents lacked discriminatory intent. They testified that the selection of CIs was based on those CIs who were available and whether the CIs had worked an operation like the Surge before. Tr. 10/30/17, 28:25–29:1 (Johnson); Tr. 12/13/17 243:19–244:25 (Johnson); Tr. 12/13/17, 308:4–14 (Zayas); Tr. 12/13/17, 310:2–8 (Zayas). The Government has maintained that "the key characteristic of the selected confidential informants in the Albuquerque operation was not their race; it was their background of dealing or selling controlled substances." Doc. 32 at 7. Nothing in the record indicates express racial bias, such as statements by agents or CIs demonstrating racial animus during this operation. *See* Tr. 12/13/17, 301:11–15 (Zayas). Both

Agent Johnson and Agent Zayas testified that they had never received implicit bias training. Tr. 12/13/17, 251:19–252:24 (Johnson); Tr. 12/13/17, 299:25–300:3 (Zayas). At most, the testimony and exhibits show a lack of training of the CIs on implicit bias (Tr. 10/30/17, 92:13–21; Tr. 10/30/17, 93:22–96:16), and although the agents answered questions about their understanding of implicit bias, there is nothing in the record representing that such training was required of agents or CIs. Tr. 12/13/17, 299:25–300:3 (Zayas) (stating he has not received implicit bias training during his twenty-eight years of work for ATF). Agent Zayas also rejected the notion that "front-loading" the CIs with African Americans would give the CIs "greater entrée into the Black community". Tr. 12/13/17, 302:11–22. He stated that it was the "color of money" that matters "when you work on the street." Tr. 12/13/17, 302:3–10. Based on the testimony of Agents Johnson and Zayas, there is no evidence in the record that either one of them intended to adversely affect African Americans in Albuquerque by selecting three African American CIs. The Court cannot accept Defendants' flawed proposition that ATF intended a discriminatory effect on African Americans in the Surge when the record shows that neither the agents nor the CIs ever received training to inform them of the possible effects implicit bias could have. Thus, even if the Court assumed without ruling that the effects of homophily are accepted as true, without even circumstantial evidence that ATF intended an adverse effect upon African Americans, Defendants only have evidence that goes to discriminatory effect and not discriminatory intent. Defendants have failed to transform the theory of homophily, which is based on passive affinities for similar individuals, into a theory sufficient to satisfy some evidence of discriminatory intent under Equal Protection standards. *See Wayte*, 470 U.S. at 610 ("Even if the passive policy had a discriminatory effect, petitioner has not shown that the Government intended such a result . . . . Absent such a showing, his claim of selective

prosecution fails."); *cf. United States v. Hare*, 820 F.3d 92, 100 n.6 (4th Cir. 2016) (ruling that even "willful blindness does not evince discriminatory intent" in ATF stash house selective enforcement case and quoting *Wayte*, 470 U.S. at 610).

Finally, the Court disagrees that evidence regarding the "conspiracies" that developed out of individual meetings between CIs and targets supports a finding of circumstantial evidence of discriminatory intent.[7] Tr. 10/30/17, 31:17–19 (Johnson); Tr. 10/30/17, 30:16–31:5 (Johnson). The record reflects that, in some instances, the targets of the investigation referred the CIs and agents to other individuals to conduct transactions involving firearms and narcotics. Tr. 10/30/17, 29:24–31:5 (Johnson); Tr. 10/30/17, 100:6–16 (Johnson); Tr. 10/30/17, 34:13–49:5 (Johnson) (describing the conspiracies in Exhibit 57). Race was not part of ATF's decision to pursue an individual who was recruited by an already-existing target or to pursue an initial target. Tr. 10/30/17, 52:13–23 (Johnson). As Agent Johnson testified, "[t]he conspiracies are determined by the targets, and we have no control over that," and it was not within the agents' discretion to decide who a target would bring into a transaction. Tr. 10/30/17, 51:21–25. Contrary to Judge Armijo's opinion that the development of the conspiracies is supported by the theory of homophily, this Court is unwilling to find discriminatory intent on behalf of ATF because targeted individuals chose to recruit others into criminal activity. As Judge Browning phrased this conclusion in his opinion denying discovery in the parallel case of *United States v. Laneham*, "[t]he Court is not eager to infer racial bias based on whom a targeted individual chooses to recruit." 2017 U.S. Dist. LEXIS 176486, at *96 (citing *United States v. Colon*, 71 F. Supp. 3d 269, 283 (D. Conn. 2014) (Meyer, J.) ("[T]here is no evidence that the government did

---

[7]     Neither Defendant Jackson nor Defendant Coleman was recruited through a conspiracy, as both were approached directly by CIs. 16-CR-2362, Doc. 29 at 4; 16-CR-2363, Doc. 28 at 3. Still, the Court addresses this point because Judge Armijo previously addressed this issue and Defendants rely on Judge Armijo's treatment of this issue in their arguments that there is some evidence of discriminatory intent.

anything to select any of the seven defendants except for the two Colon brothers, who themselves chose their own co-conspirators.")); *see also United States v. Brown*, 299 F. Supp. 3d 976, 1008 (N.D. Ill. Mar. 12, 2018) (concluding that a significant percentage of the pool of defendants was not randomly selected by ATF if they were recruited by initial targets). Agent Johnson's testimony supports this finding, as he testified to this point that

> [t]he defendants make the decision on who they bring to transactions or who they choose to associate with for illegal activity. We don't make that choice for them. We don't tell them who to bring. They bring individuals that they associate with for whatever reason they choose.

Tr. 10/30/17, 52:13–17. This Court joins in the opinion that ATF cannot be held responsible for the decisions of individuals recruited by those already under investigation to join in criminal activity.

Thus, even if the Court accepted the theory of homophily as indisputably true, the social effects of the concept fall short of showing that ATF intended that "adverse consequences" affect African Americans specifically, and these effects fall short of even the lowered discovery standard of "some evidence" in these circumstances. The record does not establish "some evidence" that ATF selected three African American CIs "because of" and "not merely in spite of," *McCleskey*, 481 U.S. at 298, an adverse effect it would have on African Americans in the operation. The Court agrees with the previous ruling on this issue that the theory of homophily is insufficient for discriminatory intent, but further clarifies that evidence of homophily in these circumstances is insufficient to make a credible showing of even "some evidence" of discriminatory intent by ATF.

### 2. "Prior misconduct"

Defendants also attempted to show discriminatory intent through evidence of "prior misconduct" by ATF in other undercover operations. Doc. 73 at 18. Defendants assert that

"[e]vidence of ATF's past behavior is highly relevant circumstantial evidence that may be used to infer intent, particularly when many of the agents involved in prior sullied operations were also involved in the Albuquerque ATF sting that led to [Defendants'] arrest[s]." Doc. 35 at 5. Much of Defendants' evidence and argument about "sullied operations" revolved around poor publicity about the "stash house" sting operations conducted by ATF, particularly in the Chicago area.[8] Doc. 29 at 8–12. Many of the stash house cases involved defendants charged for conspiracy and firearms possession in preparation for the fictional robbery. *See United States v. Lewis*, 641 F.3d 773, 776 (7th Cir. 2011) (explaining that stash house conspiracy defendants were convicted of "conspiring to distribute cocaine that didn't actually exist—cocaine they planned to liberate from a fictional stash house guarded by members of an imaginary Mexican cartel"); *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009) (providing that "[t]hough it might seem odd, the fact that the stash house, the drugs—and indeed the whole plot—was fake is irrelevant," as "[t]he crime of conspiracy is the agreement itself").

Judge Armijo found Defendants' argument on these grounds "unavailing" because the operation tactics used in Albuquerque were not the same kind used the stash house cases, and this Court agrees with her conclusion on this particular issue. Doc. 73 at 18; Tr. 12/13/17, 248:21–23 ("Q: All right. And none of the Surge cases reflect a stash house operation? A: That is correct." (Johnson)).[9] Defendants Jackson and Coleman were charged for conduct relating to transactions that transpired involving narcotics and firearms, which is in contrast to the stash

---

[8]   The stash house sting operations conducted by ATF (many in Chicago, but also elsewhere) were widespread operations in which "undercover agents present individuals . . . with an opportunity to rob a fictitious drug stash house." *United States v. Brown*, 299 F. Supp. 3d at 983*; see also* Tr. 12/13/17, 248:4–15 (describing stash house operations).

[9]   Agent Zayas clarified that none of the charges resulted from stash house operations. His testimony reflects that ATF did attempt to "engage in some 'sting' house operations here in Albuquerque." Tr. 12/13/17, 314:22–315:12.

house cases in Chicago where the common thread for prosecutors was charging defendants for inchoate crimes involving conspiracy and attempt in preparation for the fake robberies. *See Brown*, 299 F. Supp. 3d at 989, 991 (explaining the remaining charges against defendants in consolidated Chicago stash house cases were for conspiracy, attempt to commit Hobbs Act robbery, and possession of a firearm in furtherance of a crime of violence). Operations by ATF involving other cities, even if ATF enlisted some of the same agents in the Albuquerque cases[10] (*see* Doc. 29 at 13–14), do not show a pattern of behavior requiring the Court to infer discriminatory intent because the Albuquerque operation did not use the stash house set-up. Defendants have not provided legal authority that would require or persuade this Court to infer discriminatory intent from ATF operations in other cities using other tactics. Additionally, while the "stash house" cases have drawn scorn from various sources, defendants failed to persuade Chief Judge Ruben Castillo of the U.S. District Court for the Northern District of Illinois of the merits of the selective enforcement defense, and the constitutionality of those operations has been upheld. *See Brown*, 299 F. Supp. 3d at 1026 (concluding, however reluctantly, that the Court could not find the defendants had carried their burden so as to warrant dismissal of their indictments on the merits of their selective enforcement claims).

### 3.      Target area

Finally, the defense argues that ATF purposefully targeted the southeast quadrant of the city because of its black population, which Judge Armijo also rejected as evidence of discriminatory intent. Doc. 73 at 19. While the parties disputed the statistics regarding the racial

---

[10]      Defendants argue that Agent Zayas "is the architect behind the infamous phony stash house cases. He helped originate the tactic, authored the playbook on the tactic, and has travelled around the country leading trainings on the tactic." Doc. 29 at 14. These two cases do not involve stash house prosecutions, however, and the Court is not convinced by Defendants' argument that the Court must infer discriminatory intent because of the participation of Agent Zayas in this non-stash house operation.

composition of the target area (Doc. 73 at 18–19), Judge Armijo relied on different statistics to determine that the African American composition of the southeast quadrant was 5.12%. *Id.* at 19 (citing ABQ i-team report admitted by the Government). Judge Armijo found that "Defendants' showing as to discriminatory intent based on selection of the target area is insufficient at this time." *Id.*

This Court agrees with Judge Armijo's finding that Defendants failed to show discriminatory intent because of ATF's strategic focus on the target area. Moreover, the Court is not convinced that the statistical racial composition of the southeast quadrant of Albuquerque is dispositive of this issue. Agent Johnson testified that ATF targeted Albuquerque for the Surge because of the "high level of violent crime that has plagued Albuquerque for years." Tr. 10/30/17, 23:9–14. This determination was based on ATF's analysis of crime statistics of cities across the country, although Agent Johnson did not identify who specifically made the determination to bring ATF to Albuquerque. Tr. 10/30/17, 24:13–24. On cross-examination, he testified that

> [w]e go into cities that are listed every year as, you know, top-ten violent crime cities by statisticians and individuals a lot smarter than me when it comes to calculating numbers. I don't make that determination on if a city qualifies or has enough violent crime.

Tr. 10/30/17, 79:21–25.[11] He further provided that the target area became focused on the southeast quadrant of the city[12] after ATF consultations with local law enforcement, who

---

[11]     *See* Exhibit R (Executive Summary Report) at 2 ("New Mexico was selected due to its ranking, based upon 2013 data, as the second (2nd) highest violent state in the United States. A review of the FBI Uniform Crime Report (UCR) and ATF compiled data revealed that the city of Albuquerque and the city of Santa Fe share extremely high violent crime rates when compared to similarly sized cities.").

[12]     Agent Johnson described the target area according to the street names in his testimony. Tr. 10/30/17, 26:19–28:5; 27:8–13 ("We were told that if you focus on Central as the main vein or the main hub that runs through the southeast quadrant, down as far as San Mateo, up as high as Wyoming or Eubank, out—I guess that would be south towards, I know it was the Gibson area or Gibson Avenue, and then back towards I-40, Lomas, kind of in that area.").

"explained that that's where all their—or the high majority of their violent crime calls come from and where they respond to violent crime." Tr. 10/30/17, 74:17–19. Agent Johnson testified that

> based on all of our discussions with Albuquerque Police Department, the Bernalillo County Sheriff's Office, Drug Enforcement Administration, the local ATF office, United States Marshals, New Mexico State Police, everybody stated that the southeast portion of Albuquerque was where the main hub of the violent crime was.
>
> . . . .
>
> After talking with our local, state, and federal law enforcement partners, it was determined that would be the first area of Albuquerque that we would concentrate on, based on an overwhelming response that the southeast portion—or as it's known in the community, the War Zone—that that would be the initial focus.

Tr. 10/30/17, 25:17–23; 26:12–17. Agent Zayas similarly testified regarding meeting with local law enforcement: "The information that they were bringing us was, the most violent area of the city was the southeast, also known as the War Zone." Tr. 12/13/17, 287:8–10.

ATF specifically came to Albuquerque to address the violent crime issue that has "plagued" the city for years.[13] After arriving and consulting with local law enforcement, ATF determined that the southeast quadrant of the city was an area of high violent crime and that it

---

[13]    After the conclusion of the Surge operation, Damon Martinez who was U.S. Attorney at the time, stated: "The purpose behind this investigation and its resulting prosecutions is to ensure that we keep control of our streets. The law enforcement community is sending a loud and clear message to the worst of the worst offenders in our community: you cannot commit crime in New Mexico with impunity and without consequence. We are putting you on notice. We are watching, and we will continue to be vigilant." Doc. 29, Ex. A at 2. Damon Martinez's statements presage those made recently by Mayor Tim Keller. In June 2018, Mayor Keller announced a new initiative to reduce crime in Albuquerque, particularly gun violence, which increased by 70% between 2015 and 2017. *See Mayor Keller Unveils Steps to Curb Gun Violence*, available at https://www.cabq.gov/mayor/news/mayor-keller-unveils-steps-to-curb-gun-violence (last visited Aug. 16, 2018). The purpose of the initiative includes "getting violent offenders off the streets" and "keeping guns out of the hands of criminals." According to the release, 71% of homicides in Albuquerque are caused by gun violence. The Albuquerque Journal quoted Mayor Keller as saying, "While we are making progress toward reducing overall crime in Albuquerque, we know guns are being used more often as a weapon of choice, and violent crime remains a pressing challenge. We have to take action to reduce gun violence and keep our neighborhoods safe." *See* Steve Knight, Albuquerque J., *ABQ mayor unveils initiatives to curb gun violence*, June 1, 2018, available at https://www.abqjournal.com/1179761/abq-mayor-unveils-initiatives-to-curb-gun-violence.html (last visited Aug. 16, 2018).

would focus investigation efforts there to start. 10/30/17, 23:21–24:16; 25:7–23. ATF's reliance on local law enforcement experience and expertise about where violent crime is concentrated in Albuquerque was completely reasonable. These facts are adequate to support Judge Armijo's conclusion that Defendants failed to show discriminatory intent based on the selection of the target area, and this Court clarifies that the record reflects that ATF targeted the southeast quadrant of the City of Albuquerque because of the high rate of violent crime, not because of the racial composition of the population. Notably, Judge Browning made similar findings about ATF's decision to target the southeastern part of the city in another Surge defendant case. *See United States v. Laneham*, 2017 U.S. Dist. LEXIS 176486, at *4 ("Based on those consultations, the ATF determined that 'the most violent part of Albuquerque was the southeast quadrant.'" (citing Johnson testimony in *Laneham*) . . . . "The ATF did not decide to focus on southeast Albuquerque because of the area's demographics." (citing Agent Johnson's testimony in *Laneham*)). For these reasons, the Court finds that Defendants have not shown sufficient evidence at this stage that ATF possessed a discriminatory purpose in targeting the southeast part of Albuquerque.

### 4. Conclusion

Considering the three theories advanced by Defendants (homophily, "prior misconduct," and the target area), Judge Armijo noted that Defendants had not presented adequate evidence of discriminatory purpose by ATF. While Judge Armijo found that the theory of homophily was supported by the evidence, she ruled that evidence of homophily alone was insufficient to show discriminatory intent. Doc. 73 at 17. She rejected the other two theories that Defendants presented and this Court agrees with her conclusions. However, the Court is not convinced that, even taken as true, evidence of homophily would be evidence of discriminatory intent. While

Judge Armijo may have taken a more generous position regarding the evidence on homophily, she also did not find that Defendants had shown some evidence of discriminatory intent sufficient for the discovery standard. Thus, although Judge Armijo did not expressly state that Defendants failed to show "some evidence" of discriminatory purpose for discovery, her analysis of the evidence supports this Court's conclusion that Defendants have failed to meet the threshold showing of discriminatory purpose at the discovery stage. Based on review of Judge Armijo's decision and the record that was before her, Defendants failed to make a credible showing of "some evidence" of discriminatory intent to satisfy the Tenth Circuit standard for obtaining discovery in a selective enforcement claim. Because of the lack of discriminatory intent, Judge Armijo erred in granting discovery, as some evidence of both discriminatory intent and discriminatory effect is required to succeed at the discovery stage. *See Alcaraz-Arellano*, 441 F.3d at 1265 (declining to examine discriminatory effect because defendant failed to show discriminatory intent, and ruling that district court did not abuse discretion in denying discovery).

### B.      Discriminatory effect

Even if Defendants had produced some evidence establishing intentional discrimination by ATF agents, Defendants would also have to show some evidence of discriminatory effect. As the Tenth Circuit has explained, a defendant may make a "credible showing" of discriminatory effect by either "identifying a similarly-situated individual or through the use of statistical evidence." *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001) (citation omitted). Defendants relied on both types of evidence to show discriminatory effect. First, Defendants cited statistics in an attempt to show that African Americans are overrepresented in the Surge defendants; second, Defendants reference testimony and exhibits that they claim show at least

one "similarly-situated individual" who was not investigated or arrested. Judge Armijo rejected the statistical evidence, but did not rule on whether the testimony and exhibits about the similarly-situated individuals were sufficient for discriminatory effect. This Court finds that Defendants have failed to make a credible showing of "some evidence" of discriminatory effect through testimony and exhibits about the investigation, or through statistical analysis.

### 1. Statistics

Defendants cite statistics that they claim show, numerically, similarly-situated individuals were not prosecuted. Defendants point to two statistics:

1. African-Americans comprised 3.4 percent of Bernalillo County residents in 2016.[14]

2. African-Americans comprised 5.4 percent of drug trafficking offenders and 5.9 percent of firearm-related offenders in the District of New Mexico between fiscal years 2006 and 2015.[15]

Based on these statistics, Defendants argue that the fact that 27.2% of defendants from the Surge were African American demonstrates discriminatory effect. Doc. 29 at 5–6. Defendants assert that even considering that minorities are "overrepresented in the criminal justice system . . . . one might expect to see a slightly higher representation of Blacks in the Albuquerque ATF sting defendant class than a direct proportion of their representation within the population would produce—between five and seven, extrapolating." Doc. 29 at 5. Judge Armijo rejected reliance on either statistic, and this Court agrees with her conclusion on this issue.

---

[14]     See US Census QuickFacts: Bernalillo County, available at https://www.census.gov/quickfacts/fact/table/bernalillocountynewmexico/PST045216 (last visited Sept. 17, 2018).

[15]     See Race Offenders in Each Primary Offense Category, District of New Mexico, Fiscal Years 2006–2015, available at https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table04 (follow "Demographic Data" hyperlink; search "Race of Offenders in Each Primary Offensive Category"; select "District of New Mexico" for fiscal years 2006–2015) (last visited Sept. 17, 2018). Doc. 29, Ex. D.

Regarding the first statistic, the population of Bernalillo County that is African American is not central to showing a group of similarly situated individuals who were not investigated or arrested because Defendants offer no evidence that the demographic makeup of the targeted area is the same as the rest of Bernalillo County. *Accord Laneham*, 2017 U.S. Dist. LEXIS 176486, at *74 (rejecting the contention that "ATF's Surge Defendants should proportionally reflect Bernalillo County's demographics" as a matter of fact and of law). As noted above, the parties disputed the percentage of African American population in the southeast quadrant of the city, which supports the conclusion that the demographic makeup is different. Furthermore, Defendants' argument relies on the premise that individuals of all races commit the same crimes at proportional rates, which is an argument the Supreme Court rejected in *Armstrong*. 517 U.S. at 469–70 (expressly rejecting this presumption based on statistics from the United States Sentencing Commission); *see, e.g.*, *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (rejecting statistics offered by defendant that showed in preceding three years, approximately 87% of firearms charges in certain operation were brought against black defendants because the statistics provided no "statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes"). Defendants incorrectly assume that the proportion of black defendants caught in the Surge should reflect to a similar degree the proportion of black people in the general population. A statistic based on the racial composition of the entire county does not meet the criteria provided by the Tenth Circuit, which is that for statistics to be meaningful, they must include "a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." *Marshall*,

345 F.3d at 1168 (citations omitted)). Without evidence on the racial composition within the target area, Defendants have not included a "reliable measure" against which to draw the comparison.

The second statistic, while more focused towards the right direction, is still insufficient to show a discriminatory effect because there is no evidence of a group of similarly situated individuals who commit drug and firearm crimes at the same rate in the southeast quadrant of Albuquerque as across the District of New Mexico. The United States Supreme Court provided in *United States v. Bass*, 536 U.S. 862 (2002), that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." 536 U.S. at 864 (emphasis in original). Here, the statistics do not "address the critical issue of whether that particular group was treated differently than a similarly-situated group." *James*, 257 F.3d at 1179 ("[A] defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group.").

The similarly situated individuals to Defendants would also have to be individuals with some history of violent crime, as that was a significant consideration by ATF, although this was not the exclusive criteria. Tr. 10/30/17, 102:13–17; Tr. 10/30/17, 100:8–24. The percentage of African Americans who are firearm and drug offenders in the District of New Mexico provides no point of reference for a similarly-situated individual, as it certainly cannot be said that all African American firearm and drug offenders in the District of New Mexico are "similarly-situated" regarding their criminal histories and other relevant factors that ATF considered, including consultation with local law officers. The statistics at issue here must at least include some individuals who had no real criminal history. Furthermore, because these statistics are state-wide, they lack geographic specificity and make the assumption that people across the state

commit drug and firearm offenses at the same rate regardless of their geographic location—another assumption for which Defendants offer no support. *See, e.g.*, *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (rejecting statistic that 87% of firearms prosecution in specific operation were against African Americans because the statistic did not provide "any evidence regarding the proportion of blacks residing within the relevant geographical area"). In fact, this argument contradicts the reason ATF came to Albuquerque in the first place, which was because of Albuquerque's high violent crime rate. Tr. 10/30/17, 23:21–24:22. The Court therefore agrees with Judge Armijo's rejection of these statistics as sufficient to show some evidence of discriminatory effect.[16]

### 2.      Testimony and exhibits

Defendants attempt to identify a similarly situated individual who was not investigated or arrested by ATF, but whose "circumstances present[ed] no distinguishable legitimate" factors to justify different enforcement treatment. *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir.

---

[16]      The Supreme Court has stated that statistical analysis can be used to show discriminatory intent as well as discriminatory effect. *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987). The Tenth Circuit has explained in an unpublished case that "[s]tatistical evidence alone is rarely enough to show discriminatory purpose. Although the Supreme Court has accepted statistics as proof of intent to discriminate in certain limited contexts, only in rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012) (citations and quotation marks omitted). The Court in *Blackwell* noted that the pattern of discrimination must be so stark "that the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration that the state acted with a discriminatory purpose." *Id.* (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)). The Tenth Circuit pointed to two cases in which the statistical pattern was sufficient to show discriminatory intent. In *Gomillion*, the Supreme Court found a Fifteenth Amendment violation when the state adjusted the voting district to exclude 395 of 400 black voters without excluding any white voters. In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), none of more than two hundred Chinese applicants received laundry operation permits, while only one white applicant was denied. As the Supreme Court stated in *Village of Arlington Heights v. Metro Housing Development Corp.*, 429 U.S. 252 (1977), "[a]bsent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." 429 U.S. at 266.

For the same reasons discussed in this section, these statistics are flawed and do not show discriminatory intent, which is more difficult to show with statistics than discriminatory effect. The Tenth Circuit's reasoning in *Blackwell* is persuasive and offers guidance in this analysis because these statistics do not present such a strong correlation that they require the conclusion that discriminatory intent existed, as in *Gomillion* or *Yick Wo*. Judge Armijo properly considered the statistics under the discriminatory effect prong, which is why the Court has approached the analysis in this manner.

2005) (citation omitted). To this point, Defendants elicited testimony from Agent Johnson about the investigations in multiple cases where white or Hispanic individuals were not ultimately charged in federal court.[17] In their response brief, Defendants contend that there are eight individuals[18] identified on the record who qualify as a similarly-situated individual sufficient to show discriminatory effect. Judge Armijo referenced the circumstances in three of them in her Memorandum Opinion and Order, but the Court addresses each of these cases in more detail below.

Regarding these eight individuals, there is insufficient evidence that they are adequately "similarly situated" to Defendants Jackson and Coleman, or that ATF failed to equally attempt to investigate these individuals. Agent Johnson's testimony reflects that ATF did attempt to identify the white male supplier in the case of Yusef Casanova, as Agent Johnson testified that

> [w]e continuously tried to ID him. We had very few people that we had purchased evidence from that remained unidentified. He was one of them. So it was a continuous thing, where we had resources with the Albuquerque Police Department and databases where they could query if somebody was pulled over. We utilized every resource we had, pulling the surveillance video, trying to get a good head shot and run it against every associate we could possibly find of the registered owner or of Mr. Casanova.

---

[17]   The Government contends that "[a]fter a tedious and exhaustive review of the thousands of pages of discovery generated by the Surge, the government has identified the following potential targets who were identified but not pursued or charged[,]" Doc. 89 at 15–17, which the Government proceeds to list over two pages of bullets, without reference to specific exhibit numbers or hearing transcripts. *See also* Doc. 101 at 4–6. Based on this "list", the Government argues that "[i]t is difficult to assign racial animus or to label the ATF agents as 'racists' who wanted to arrest black people, when the majority of the 'John' and 'Jane Does,' who were not pursued or charged and those that ATF proverbially let slip through the net, were black." Doc. 89 at 19. The Government previously submitted what appears to be the same or similar evidence and argument in its *Opposed Sealed Motion to Submit Supplemental Briefing*, Doc. 64 (filed 11/27/17), which Judge Armijo denied. Doc. 74. The Court has considered the information in Exhibits 1–56, which were admitted at the evidentiary hearing. The Court will not, however, consider this *argument* now, as the Government did not argue at the evidentiary hearing that the "majority" of the individuals not pursued were African American. *See also* Doc. 97 at 16 (presenting Defendants' objection to the presentation of this information). Judge Armijo denied the Government's *Motion to Supplement* and the Court declines to conduct a new evidentiary hearing on whether the "majority" of individuals not pursued were African American.

[18]   Defendants also identify the case of Gonzalo Revet, an African American defendant who was charged with at least one federal crime out of the Surge operation. Defendants point to Mr. Revet's case as a point of comparison, but Mr. Revet is not a defendant in these two cases and thus the usefulness of this comparison is limited.

Tr. 10/30/17, 166:5–16; Tr. 10/30/17, 165:13–16 ("So it wasn't that we ran the tag, it wasn't him, moved on. You know, through addresses, past and present, of the registered owner, we tried to find associates that looked like the guy that brought the meth that day."); *see* Tr. 10/30/17, 163:22–167:14 (describing ATF's effort to identify the supplier in *Casanova*). In the case of Joseph Renteria, the record reflects that ATF tried repeatedly to conduct undercover narcotics purchases with him, but he failed to follow through or return telephone calls. Tr. 10/30/17, 180:8–21. Agent Johnson testified that "every effort was made to pursue him as a defendant" but that ATF was unsuccessful in setting up the contact. *Id.* In the case of Charles Gomez, ATF could not pursue charges because he sold the agents fake narcotics and then failed to return any telephone calls to the CIs. Tr. 10/30/17, 181:17–20; 182:21–24. ATF did not charge Richard Flores, a.k.a. "Silent," because after the narcotics deal fell through, he failed to reciprocate their multiple attempts to contact him. Tr. 10/30/17, 187: 9–19. In these cases, there was no way to bring charges against these individuals because they did not commit any crimes, in spite of ATF's efforts to investigate and setup undercover purchases. Tr. 10/30/17, 180:11–14 (Johnson) ("So if they choose not to answer the phone or to show up with narcotics, and we never hear from them again, that's not on us."). The record reflects that ATF adequately attempted to pursue or investigate these individuals identified by defense counsel in their brief. This Court cannot accept Defendants' representation that ATF discriminated against individuals who did conduct illegal narcotics and firearms purchases by not further investigating other individuals who, for whatever reason, did not do the same, despite ATF's efforts to pursue those individuals.

Regarding the remaining individuals identified by counsel in their brief, Defendants do not provide adequate proof of discriminatory effect because there is not enough evidence that these individuals were similarly situated to Defendants. As Judge Armijo pointed out, the

strictness of the "similarly situated" standard is part of the high burden on a selective enforcement defense because it "seems to require that defendants be virtually identical (not merely similar) with other unprosecuted individuals." Doc. 73 at 20 (citing Thomas P. McCarty, United States v. Khan, *461 F.3d 477 (4th Cir. 2006): Discovering Whether "Similarly Situated" Individuals and the Selective Prosecution Defense Still Exist*, 87 Neb. L. Rev. 538, 562 (2008)). In the Surge, the scope of similarly situated individuals is narrowed by a number of factors, including by the consideration of criminal history and the target area, as well as the goals of the operation to focus on firearms and narcotics trafficking by "the worst of the worst" criminals. *Accord Laneham*, 2017 U.S. Dist. LEXIS 176486, at *86 ("[I]n this case, the ATF was not looking for people who could be arrested for a particular crime; they were looking for people *with certain criminal backgrounds* who committed a particular crime."). In the case of Joseph Hall, ATF attempted to set up a narcotics purchase through the CI, but Mr. Hall failed to show or respond to telephone calls. Tr. 10/30/17, 176:22–177:2; Ex. 30. The CI later encountered Mr. Hall, and Defendants argue that ATF's failure to follow up on the later encounter is sufficient for discriminatory effect. Tr. 177:3–178:3; Doc. 97 at 13. The report of investigation (Ex. 30) reflects some of Joseph Hall's criminal background (although there is no finding of accuracy about the criminal history), but this is insufficient based on the flexible criteria, which was not exclusive to criminal history and considered the input of local law enforcement officers and the type of transaction at issue (and Mr. Hall notably did not conduct any transactions with agents). *See* Tr. 10/30/17, 29:2–15, 30:9–12; Tr. 12/13/17, 293:22–294:14. Also to this point, Agent Zayas testified to the following regarding the circumstances about why another identified individual, Ryan Lewis, was not charged in federal court:[19]

---

[19]     Additionally, regarding the case of Ryan Lewis, Agent Johnson testified that he was charged in state court for the narcotics purchase in which he participated, and Defendants now claim Mr. Lewis was not charged. Tr.

Q. Now, you were asked with regard to questions about Ryan Lewis. Can you compare Ryan Lewis to Lonnie Jackson in terms of what kind of targets they would have been for ATF?

A. Ryan Lewis only has arrests, no violent arrests. Lonnie Jackson has at least four felony convictions. Same thing with Mr. Coleman, multiple convictions. Compared to Ryan Lewis, who is not a felon, and sold half an ounce of meth versus multiple-ounce dealers and, in Coleman's case, selling firearms.

Tr. 12/13/17, 282:5–14; *see also* Tr. 12/13/17, 238:17–21 ("My understanding of this investigation, we only purchased half an ounce of methamphetamine from Mr. Lewis, and looking at his criminal history on the document you provided, his criminal history wasn't extremely high."). Considering this testimony, Defendants have also failed to show how Mr. Lewis was sufficiently similarly situated to Defendants.

Next, Defendants point to the circumstances of Defendant Jackson's case to support its position that the defense has identified a similarly situated individual of another race who was not investigated by ATF. At the evidentiary hearing, Agent Johnson testified that Defendant Jackson sold two ounces of meth on two different occasions at his residence. Tr. 10/30/17, 149:4–17. At the first transaction, the surveillance team observed Defendant Jackson leave the residence and interact with someone in a Chrysler 300 parked down the road, and then Jackson returned to the residence and conducted the transaction. Tr. 10/30/17, 154:8–13; Exhibit L. At the second transaction, an occupant of the Chrysler 300 followed the CI and undercover agent into Defendant Jackson's house. Tr. 10/30/17, 154:14–17; Ex. L. Agents ran the license plates for two vehicles that were at the scene of both transactions, including the Chrysler 300. Tr. 10/30/17, 152:17–153:14. The vehicles came back registered to two names, which the record reflects may have been associated with one Hispanic individual, Tr. 12/13/17, 242:8–12, thought to reside nearby based on the registered addresses for the vehicles. Tr. 10/30/17, 152:17–153:14.

---

10/30/17, 159:9–20; Doc. 97 at 10. This Court has no evidence either way about whether Mr. Lewis was charged in state court. Ex. 37.

In response to the question of why "neither of those men who were at both of these alleged buys were ever pursued or became part of this ATF surge operation?" Agent Johnson responded:

> There was never any evidence they did anything other than park their vehicles in close proximity to their residence. Mr. Jackson never told anybody that those were his source of supply. Mr. Jackson merely told the undercover, "Here, come back to this bedroom with me. Here's two ounces for sale." He did that on both occasions. He didn't say, "That's my guy driving the 300." Mr. Jackson never told anybody, "That was my source of supply."

Tr. 10/30/17, 153:15–154:1. Agent Johnson further testified:

> They never sold any methamphetamine to anybody. It was Lonnie Jackson who sold the methamphetamine on both occasions. There was no evidence to suggest that those two individuals, or either one of those guys, sold anything. If we had information or evidence, video, then that's a different story.

Tr. 10/30/17, 154:20–25. Agent Johnson also stated:

> We were never able to see that he actually received narcotics from the vehicle or that he provided money back to the vehicle. The car did appear to be doing countersurveillance during the operation, which we didn't know if it was a source of supply, if it's Mr. Jackson's security since he was doing the deals at his house. We were never able to get evidence regarding what exactly the 300's role was.

Tr. 10/30/17, 149:25–150:9. Agent Zayas similarly testified:

> Q. Okay. And with regard to this Chrysler that you talked about, is there a reason why charges were not pursued against Mr. Davila?
> A. We had no way to verify if he was actually in the car, if he provided meth to Mr. Jackson. You know, you can't simply arrest people on assumptions or guesses of who might be in the car. You know, we weren't inside the car. Mr. Jackson never told us that the individual in the car gave him the methamphetamine. So that guy was not arrested.

Tr. 12/13/17, 282:15–24. Based on this testimony and review of Exhibit L, there is not sufficient evidence that the individual identified as the registered owner of the two vehicles was similarly situated to Defendant Jackson, in part because there was only circumstantial evidence at best that

the individual in question was the source of supply to Defendant Jackson. As explained below, it is not within the province of the judiciary to direct law enforcement officers how to make decisions based on circumstantial evidence.

Furthermore, if the agents were never able to identify an individual, then there is no evidence of whether he or she was similarly situated to Defendants. This is the case with the unidentified individuals in the Bernadette Tapia[20] and Casanova (*supra*) cases, as Defendants cannot show those unidentified individuals were similarly situated because there is no evidence on these unidentified individuals' criminal histories or other relevant factors to the goal of the Surge operation, including whether they were actually the sources of supply. *See* Tr. 10/30/17, 170:14–173:9, Exhibit I (Tapia case). Additionally, there was limited circumstantial evidence that the unidentified individuals in those cases, just as with the registered owner of the vehicles in the Jackson case, engaged in any criminal conduct, and so how to proceed with that kind of circumstantial evidence is correctly left to the discretion of law enforcement.

All of these determinations by ATF distill into one concept—law enforcement discretion about whether and how to investigate circumstantial evidence and pursue investigative targets in light of other variables. This Court rejects the invitation by Defendants to indulge in deconstructing law enforcement strategy to a degree that constitutes what the Supreme Court cautioned in *United States v. Armstrong*, which holds that "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision-making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). Although *Armstrong* dealt with selective

---

[20]    Also, the Court notes that in relation to the Bernadette Tapia case, a white male who sold narcotics to the CI in two transactions was charged in the federal Surge cases. Tr. 10/30/17, 171:14–172:12, Ex. I; Ex. 57.

prosecution,[21] the broad degree of hindsight criticism Defendants encourage here is subject to the same concerns of judicial overreach expressed in *Armstrong* because ATF is a law enforcement agency under the authority of the Department of Justice and the United States Attorney General. As the Supreme Court explained in the pre-*Armstrong* selective prosecution case *Wayte v. United States*, "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." 470 U.S. at 607. This Court is wary of engaging in armchair, Monday morning quarterbacking the decision making of federal agents and local task force officers who are working undercover in a dangerous, long-term sting operation. The Tenth Circuit law on prosecutorial and law enforcement decision making supports this Court's reluctance to second-guess enforcement strategy. *See, e.g.*, *United States v. Scull*, 321 F.3d 1270, 1277 (10th Cir. 2003) ("Police must be given leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." (quoting *United States v. Calva*, 979 F.2d 119, 123 (8th Cir. 1992)). In the context of discussing the analogous Due Process defense of "outrageous government conduct," the Tenth Circuit has provided that "[t]he strict nature of the . . . inquiry is due in primary part to the reluctance of the judiciary to second-guess the motives and tactics of law enforcement officials."

---

[21] The Court recognizes that selective prosecution and selective enforcement claims may differ in whether the prosecutorial presumption of regularity (affirmed in *Armstrong*) is applicable to law enforcement decisions as well. *Compare United States v. Washington*, 869 F.3d 193, 219 (3d Cir. 2017) ("[T]he special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *United States v. Armstrong* . . . does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity.") *and United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) ("Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.") *with Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) ("[T]he Supreme Court has held that to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary. Claims of racially discriminatory traffic stops and arrests should be held to a similarly high standard." (citations omitted)). The Court has not applied the presumption here.

*United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996) (citing *Hampton v. United States*, 425 U.S. 484, 495–96 n.7 (1976) (Powell, J., concurring in judgment) (noting that enforcement officials "must be allowed flexibility adequate to counter effectively [narcotics] activity")).

Certainly, such analysis has a rightful role in examining prosecutorial and law enforcement actions. As the parties addressed on the record at the August 3, 2018 hearing, the hypothetical DWI check-point would present such a situation. In that hypothetical, it would be more than appropriate to examine law enforcement strategy if there were credible allegations that an officer let white drivers pass through a checkpoint while detaining black drivers, when both black and white drivers exhibited similar signs of driving under the influence. Such a scenario lends itself to a methodical, laboratory-type analysis involving discrete variables. The undercover operation in the Surge cases, however, is not comparable to a DWI checkpoint, as is evidenced by the thousands of pages of reports, exhibits, and transcripts that constitute the record and discovery materials in these cases. Furthermore, the Surge operation revolved around unpredictable, dangerous circumstances involving firearms, large quantities of narcotics, and gang-related activity, all of which have severe implications for officer safety during an undercover operation. *See United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991) (recognizing firearms as "tools of the trade" for drug traffickers). The Court can contemplate situations in which defendants arrested after a widespread undercover operation would be able to show at least some evidence of discriminatory intent and discriminatory effect.[22] Faced with this record and the evidence offered by these Defendants, however, the Court is of the opinion that the circumstances in *this* undercover operation hinged too heavily on non-discrete, discretionary

---

[22] This was indeed the situation in *United States v. Brown*, 299 F. Supp. 3d 976 (N.D. Ill. 2018), which consisted of consolidated stash house cases in front of Judge Castillo. *See* discussion *supra* note 7 (providing details about Chicago stash house cases in *Brown*). The court there found defendants met the discovery threshold, although they failed to succeed on the merits.

decisions by law enforcement agents for this Court to engage in the fallacy of second guessing, with the benefit of 20/20 hindsight, strategic decisions made by law enforcement agents without stronger, credible evidence of why agents decided not to pursue certain individuals.

### 3. Conclusion

For these reasons, Defendants have failed to show some credible evidence of discriminatory effect. Judge Armijo rejected reliance on the district-wide statistics and the local demographic statistics, which this Court agrees were insufficient under the law outlined by the Tenth Circuit. Judge Armijo failed to make a finding on the record of whether the testimony and exhibits submitted by Defendants were adequate to identify a similarly situated individual, but this Court has concluded that this evidence is insufficient. For the detailed reasons provided for each of the eight individuals Defendants identified, as well as because of the risks of unfocused judicial overreach eschewed by the Supreme Court in *Armstrong*, this Court will not lay the heavy hand of hindsight criticism over strategic decisions by law enforcement officers engaged in undercover operations without evidence from Defendants that meets the standards enunciated by the United States Supreme Court and the Court of Appeals for the Tenth Circuit.

### C. Discovery order

Judge Armijo granted discovery requests for items (1)[23] and (3)[24] on the grounds that "[r]eview of the NCIC reports relied on by the ATF in making arrest decisions may allow Defendants to identify whether those not arrested had distinguishing characteristics other than race." Doc. 73 at 28. As Agent Johnson testified at the evidentiary hearing,

---

[23]    The [National Crime Information Center (NCIC)] criminal history report relied on by the ATF during the investigation of the member of the Albuquerque ATF surge defendant class, in each of the 103 Albuquerque ATF surge cases . . . .

[24]    All NCIC criminal reports requested or generated, related to the Albuquerque ATF Surge, by any law enforcement officer working on the Albuquerque ATF Surge, between March 1, 2016 and September 30, 2016.

NCIC reports will have all of a person's identifying information; their name; any aliases; any different forms of their name that they've used; different spellings; date of birth; Social Security number; height; weight; sometimes it has their employment; previous addresses; state ID numbers; Department of Corrections numbers; any arrests and convictions that are submitted by the different jurisdictions.

NCIC is only as good as what people put into it. You'll find some jurisdictions, they simply don't mail in or send the information to NCIC so it can be an accurate reflection. But it is a lot of personal identifying information, to include, sometimes, some addresses; if they're a felon; if they're a sex offender.

Tr. 10/30/17, 109:10–23. The record indicates that NCIC reports were often run when agents were conducting surveillance or when a CI provided information about a new individual. *See, e.g.*, Tr. 10/30/17, 153:6–10; 157:5–6; 158:23–24; 176:13–16; 180:2–4; 182:15–16. The record does not indicate that an NCIC reports was consulted for every individual or that there were pre-identified circumstances that required an agent to obtain an NCIC report.

The NCIC reports, according to Defendants' position, provide insight into what information ATF agents knew about an individual's criminal and other history at the time of the decision to investigate. Doc. 45 at 9; Tr. 10/30/17, 14:10–12 ("Those queries will show us who was targeted, who was not targeted, who was ignored, who was pursued."). Defendants argued at the evidentiary hearing that the additional discovery is necessary to establish the similarly situated comparison group to carry their selective enforcement claim on the merits, on both the discriminatory effect and discriminatory intent prongs. Doc. 45 at 3–4. From these NCIC reports, Defendants assert that "[t]he statistician the defense plans to present in advancing a selective enforcement claim will be able to run a regression analysis between the defendant class and the SSCG [similarly situated comparison group], which can isolate the independent variable (i.e., race, age, sex, criminal history) having the greatest effect on the dependent variable (i.e., the likelihood of being charged in the ATF Surge cases)." Doc. 45 at 4. A statistical analysis,

defendants contend, that was run from the NCIC reports would satisfy the Tenth Circuit's criteria for reliability of a comparison group because it is drawn from the pool of people that ATF was considering investigating or arresting in the Surge but declined to pursue. Doc. 45 at 4. Although the United States had already produced the Pretrial Services Report for the each of the ATF Surge defendants at the time Defendants made their supplemental request for these NCIC records, Defendants maintain that Pretrial Services Reports are not helpful to their statistician because ATF agents in the field consulted NCIC reports, not Pretrial Services Reports, in determining the criminal history of an individual and deciding whether or not to further pursue that person. Doc. 45 at 8; Tr. 10/30/17, 20:14–19. They assert that because ATF agents did not keep records on individuals not pursued, "[t]he most accurate replica of such documentation is to obtain all the investigative reports ran in relation to the ATF Surge, which the defense believes are logged by personal identification number and retrievable within the NCIC database." Doc. 45 at 12. Defendants summarized their position as, "[s]tated simply, in order to investigate, challenge, and impeach the ATF's claim regarding who it targeted, the defense needs to see the same NCIC reports that were reviewed by the ATF Agents when the Agents made their investigative decisions." Doc. 45 at 9.

Judge Armijo granted these two discovery requests from Defendants and reasoned that, given Agent Johnson's testimony about the lack of a "hard set" of "criteria", these NCIC records were necessary for Defendant's to build their SSCG. Doc. 73 at 27–28. She ruled that "[i]f, after receipt of the NCIC reports, Defendants can make a showing of discriminatory intent and discriminatory effect that meets the *Alcarez-Arellano* standard, the Court will consider a renewed motion regarding the remainder of their discovery requests." *Id.* at 29.

## III.    Legal conclusions

**A.    It was legal error to allow discovery when Defendants failed to meet the discovery standard for a selective enforcement claim by showing "some evidence" of both discriminatory intent and discriminatory effect.**

Defendants have maintained that the "standard required to obtain discovery on a selective enforcement claim is less rigorous than that required for a selective prosecution claim." Doc. 29 at 17–18 (citing *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015)). The Third and Seventh Circuits have indeed adopted different standards and procedures for discovery in selective enforcement defenses. In *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017), the Third Circuit ruled that "motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong/Bass* framework." 869 F.3d at 220 ("[W]e therefore join the *Davis* court in finding *Armstrong/Bass* to be distinguishable on these facts.); *id.* at 220–21 (allowing "limited pretrial inquiry into the challenged law enforcement practice on a *proffer* that shows 'some evidence' of discriminatory effect" (emphasis added)). The *Washington* court ruled, regarding the "selective enforcement discovery standard", that

> [d]istinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

869 F.3d at 221. If the district court finds that this standard is met, then the court may "conduct limited inquiries" into testimony, exhibits, and even the *in camera* review of materials. *Id.* at 221. The Third Circuit explained that this kind of limited discovery can be conducted in progressive stages and that the district court retains a broad degree of discretion in how to handle these materials. *Id.*

The Tenth Circuit, however, has not lowered the standards for discovery in a selective enforcement claim; in fact, Tenth Circuit law is clear that the standard articulated in *Armstrong* controls. The Tenth Circuit stated in *Alcaraz-Arellano* that the elements for selective enforcement and selective prosecution are "essentially the same." 441 F.3d at 1264; *see also James*, 257 F.2d at 1179 (applying selective prosecution standards to selective enforcement claim). In *Alcarez-Arellano,* the Circuit adopted the *Armstrong* discovery standard, ruling that "[a]lthough defendants seeking discovery need not establish a prima facie case . . . . they must satisfy a 'rigorous standard[.]' They must produce 'some evidence' of both discriminatory effect and discriminatory intent." 441 F.3d at 1264 (citing *Armstrong*, 517 U.S. at 468) (stating "[i]n *James* we applied this standard to a claim of selective enforcement" (citing 257 F.3d at 1178–81)). The Tenth Circuit does not provide that the district court may conduct limited discovery or authorize certain discovery requests when the required showing is not met by the evidence in the record. Furthermore, the required showing in the Tenth Circuit is not satisfied by a "proffer" that is "strong enough to support a reasonable inference" of discrimination—the Tenth Circuit intended a more "rigorous standard." *Id.* Thus, despite Defendants' urging that the discovery standard is lower for selective enforcement claims (*see* Doc. 29 at 17), the Tenth Circuit rule is clear, and this Court does not have authority to adopt the distinct approach of the Third and Seventh Circuits.

Thus, the partial discovery previously granted by Judge Armijo was granted in error.[25] Judge Armijo failed to find sufficient evidence of discriminatory intent, as she rejected the

---

[25] In reaching this conclusion, the Court does not find that it is necessary to interpret Judge Armijo's ambiguous statement, "As Defendants acknowledge (Doc. 45), their showing is insufficient to meet the *Alcarez-Arellano* standard." Doc. 73 at 26. While the parties hotly dispute whether this statement was supposed to be a finding that the showing was insufficient to obtain discovery (as the Government asserts) or whether this statement simply meant that Defendants could not succeed on the merits without discovery (as Defendants contend), this Court does not need to enter the choppy waters of interpreting this ambiguous statement when the record clearly supports

defense theories built upon "prior misconduct" and the target area of the Surge, and she found that evidence of homophily alone was insufficient to support discriminatory intent. Doc. 73 at 13–18. This Court now clarifies where the record was previously ambiguous that Defendants failed to carry the burden of showing some credible evidence of discriminatory intent, as this Court has concluded that all three theories put forward by Defendant fail to meet the discovery standard. The Tenth Circuit has explained that where a defendant fails to show one prong of the selective enforcement claim, the district court need not consider the other. *See Alcarez-Arellano*, 441 F.3d at 1266; *James* 257 F.3d at 1181. Therefore, the failure to show discriminatory intent alone is sufficient to deny Defendants' discovery requests in whole.

Even if Defendants had shown some credible evidence of discriminatory intent, Defendants failed to show some evidence of discriminatory effect because they could not identify a similarly situated individual through statistical analysis, or through exhibits and testimony. Judge Armijo rejected reliance on the statistics that Defendants provided, and this Court agrees that those statistics are inadequate under Tenth Circuit law. After summarizing some of the evidence from the extensive record, Judge Armijo failed to make a finding of whether Defendants satisfied the showing for discriminatory effect based on the individuals identified by the defense as "similarly situated." This Court concludes that the testimony and exhibits in the record are insufficient to show some credible evidence that a similarly situated individual was not investigated or arrested on account of his or her race.

Defendants claim that the fact that Judge Armijo granted discovery means "it is reasonable to conclude that" she found the evidence sufficient to favor Defendants. Doc. 97 at 18. Defendants' logic, however, is flawed—first, because the absence of a clear finding on either

---

this Court's determination that it was legal error to grant discovery for the reasons described in this *Memorandum Opinion and Order*.

prong does not allow this Court to reasonably conclude that the evidence must have favored Defendants in the preceding judge's opinion. As Defendants even state in their brief, "[t]he Defendants admit that the Court's order [Doc. 73] may not be a model in clarity, as the Court did not explicitly state that it found 'some evidence' of intent and effect." Doc. 97 at 18. Given that there was no finding that Defendants met the discovery standard on either prong, and in light of this Court's review of the record, the Tenth Circuit law will not allow a "reasonable conclusion" that Defendants met the evidentiary burden in this case—this would not be a "rigorous standard."

Secondly, Defendants' logic is flawed because the legal analysis for this Motion to Reconsider is not retrospective, in that it does not start with the conclusion and work backwards to deduce that there must not have been any error. The Court rejects Defendants' suggestion that there is "an appropriately deferential standard of review" here. Doc. 97 at 18–19. This Court owes no deference to the legal ruling of a prior judge on an interlocutory discovery order, and it may reconsider to any degree the fact-finding and legal conclusions previously reached. *See* discussion *supra* Section I.C. Even if this Court were bound to the law of the case doctrine, the legal error in the discovery order is clear based on a review of the record, and the discovery order continues to work a manifest injustice upon the Government through the unmanageable burden of discovery that Defendants have requested (*see* discussion *infra*). As the existing record has proven exhaustive and extensive,[26] reliance on the current testimony, exhibits, and pleadings has been more than adequate for the Court to rule on the current motion.

Regarding the prior legal ruling to grant partial discovery, however, the decision does not appear to have been based on law adopted by the Tenth Circuit. The discussion of *Davis* and *Washington* (Doc. 73 at 9–11), and criticism of the *Armstrong* evidentiary standards (*id.*), even if

---

[26]     To any extent that the Government has tried to present "new" information to the Court (*see* discussion *supra* note 17), the Court is not convinced such evidence would lead to a different result given the Court's ruling.

followed by recitation of the law under *Alcarez-Arellano*, make it difficult for this Court to find

that the discovery ruling was based on Tenth Circuit law, and not that of the Third or Seventh

Circuits. Additionally, citation to a Seventh Circuit district court case, in which the trial court

applied the logic in *Davis* and allowed limited discovery of ATF's policies in a stash house case,

precedes the legal ruling announcing the granting of the two discovery requests and creates the

appearance of legal authority. Doc. 73 at 26. Given this context, and the absence of a finding that

either prong was satisfied, it appears to this Court that the granting of even limited discovery was

in error, as the Tenth Circuit law will not allow any discovery in the present cases.

**B.      The Government has complied to the fullest extent possible with the Discovery Order and ordering more disclosure of discovery material would be an unmanageable burden on the Government.**

The practical effects of this Court's finding that discovery was granted in error are

limited, however, because the United States has complied to the fullest extent possible with the

discovery order already.[27] While the United States has already provided over 6,000 pages of

discovery to defense counsel (Tr. 8/3/18, 25:18–20), the parties dispute the meaning of

"generated" in discovery request number (3), which requested

> All NCIC criminal reports requested or generated, related to the Albuquerque ATF Surge, by any law enforcement officer working on the Albuquerque ATF Surge, between March 1, 2016 and September 30, 2016.

Specifically, the defense maintains that request (3) includes every NCIC report search that was

entered into the search system in relation to the Surge during the seven month period of March 1,

---

[27]      Additionally, the Government previously disclosed to defense counsel for Defendants Jackson and Coleman at least eighty-two pages of discovery pursuant to Judge Parker's order for discovery in *Casanova*, 16-cr-2917-JAP; Doc. 45 at 2. Thus, some of the requested items had already been turned over to the Public Defender's Office before counsel filed their Supplemental Requests (Doc. 45). Additionally, the Federal Public Defender's Office has already received discovery, including the NCIC reports, for cases that the office represents. Tr. 10/30/17, 15:9–11.

2016 to September 30, 2016. The Government contends that it is only required to turn over the NCIC reports in its physical possession in hardcopy form, which it has already done.

As the Government stated at the August 3 hearing, it maintains that

[t]he order says, the reports generated, which is going to mean hard copies, and we've given those. And our position is, it's not anything that may have been looked up on a screen, not something that may have been verily relayed from one person to another, it's reports generated. Pieces of paper.

Tr. 8/3/17, 23:15–20. The Government contends that, by turning over all of the NCIC reports that were in its physical possession, it has complied with the Court's order. Doc. 89 at 24. The Government explains that it has turned over the "NCIC reports on all named defendants for which there is an NCIC report, thus the first defense request granted by the Court has been satisfied by the government. The government has further provided the defendants with all of the NCIC reports in the government's possession for individuals of interest who were not arrested or charged." *Id.* The Government asserts that it has therefore provided "all NCIC reports that were generated and maintained by the Government in hard copy form during the Surge whether for named defendants or for others who were identified." *Id.*

The Government also states that it cannot produce NCIC records in accordance with Defendants' position because it would be unduly burdensome to obtain these materials from the NCIC system, which is operated by the FBI and not by the United States Attorney's Office.[28] The United States has determined that up to twenty-seven individual officers or agents may have run NCIC reports related to the Surge. Doc. 89 at 26. At the August 3, 2018 hearing, the Government explained that "oftentimes when people run NCIC checks, they don't specify who is running it." Tr. 8/3/18, 24:6–9.

---

[28] The Government also presents arguments on relevance and the overbreadth of the requested NCIC results. The Court does not address these arguments because it finds the Government has complied with the order.

The Government posits that it would require a massive amount of manpower and machine power to attempt to gather all of the reports generated, but never physically printed, to the extent that FBI officials "were worried how the system would even handle generating these requests. It would be so massive they couldn't even begin to estimate the man hours." Tr. 8/3/18, 24:15–24. The gathering of these reports would require the system to run on weekends and at night so the system would not be overloaded, the effect of which could be that law enforcement officers in need of NCIC reports might find that the system was not functioning. Tr. 8/3/18, 24:15–24; Doc. 89-1, ¶ 16.

Finally, there are issues of privileged or sensitive information that would have to be redacted, along with some formulation for how to determine that the reports are actually products of searches related to the Surge, and, finally, how to recreate the reports in their 2016 versions. It seems that these tasks would either fall to the FBI, the United States Attorney's Office, or the Court itself.

Defendants contend that the discovery request requires the Government to produce any NCIC report that resulted from a query related to the Surge in the NCIC system by any agent who was working on the Surge operation, tangentially or part-time, regardless of whether the report was ever reduced to hard copy. Doc. 45 at 12. At the hearing in front of Judge Armijo, defense counsel summarized the usefulness of the NCIC report request as follows:

> And then the second class of NCIC reports that we're discussing, that the Court referenced, those would be the individuals that were queried in the field or back at the office during this four-month surge.

These were individuals that were reported to the agents, undercover agents, by their confidential informants. And then the histories were run, and it's our understanding that the agents would then tell their confidential informants to pursue or not pursue some individual.

That goes directly to our claim of selective enforcement. That information is available, and it is direct evidence, potentially, of discriminatory intent and effect.

Tr. 10/30/17, 21:4–18. Defendants argue that the Government can produce these NCIC reports by using the identification or badge number for each agent who ran the report during the timeframe outlined. Tr. 8/3/17, 39:22–40:5. They assert that "[t]he Government effectively is trying to widen the playing field and say it's impossible for us to meet that. We're not even asking for them to widen the playing field. We're asking for them to run a limited search of these particular agents who had requested during a particular period of time NCIC reports." Tr. 8/3/18, 40:12–17.[31] As defense counsel phrased it, "[o]ne can't imagine that the FBI, with all of its technological advances, is somehow unable to find out what NCIC reports certain agents ran over a certain period of time." Tr. 8/3/18, 40:12–16. But Defendants do not offer any other evidence or affidavits[32] to support their contention that the Government has overblown the amount of resources this request would take, or that identification or badge numbers are actually required for searches. While defense counsel alluded to their investigator, who is a former task force officer with the ATF, defense counsel has not offered an affidavit, and the Court cannot weigh the credibility of counsels' non-expert arguments on an issue as technical as procuring records from interactive FBI databases.

---

[31]     Although defense counsel mentions that Defendants can narrow the request to the searches of "four or five individuals," they have put forward no other information about the narrower request, nor have they filed anything narrowing the discovery request from the pool of twenty-six or twenty-seven individuals who worked on the Surge. Tr. 8/3/18, 36:25–37:5. The Government appears to continue to believe the request is for the records from the searches of twenty-seven agents. Tr. 8/3/18, 65:8–14.

[32]     As the Government submitted the affidavit of Ms. Zirkle attached to the *Motion to Reconsider*, Defendants had notice and opportunity to provide their own affidavit.

The Court finds that the Government has complied to the fullest extent possible with the ordered discovery in item number (3) by producing all of the NCIC reports it has in its possession for all of the Surge defendants, including for all of the queried individuals who were not charged but whose NCIC reports were printed. As discovery was already granted in error, the Court will not propound that error by ordering the Government to produce more discovery. It is also notable that when granting partial discovery on the same requests, Judge Parker did not accept the broad construction that Defendants advocate here. *Casanova*, 16cr2917-JAP, Doc. 83. Judge Parker ruled that "the Court will order the government to produce those NCIC reports and transaction records that are in its possession and were created or obtained by Agent Johnson in relation to this operation. The Court will not, however, order the government to re-create NCIC reports that were not kept by ATF and are not in the possession of the Government." *Id.* at 3. Accordingly, this Court will not compel the Government to produce the records that are not within its possession if they were never printed from the NCIC database; if the Government has in fact produced all of the NCIC reports in its possession, then it has fully complied with the discovery order. Despite Defendants' contention that it is possible to do so, Defendants' request would impose an unmanageable burden on the Government, and is an unfeasible task that would usurp valuable Court and public resources. The affidavit of Ms. Zirkle demonstrates her knowledge on this point, and the Court finds her representations credible and persuasive.

These considerations are exactly what the United States Supreme Court cautioned about in *United States v. Armstrong*, and this is likely the type of extreme situation the Supreme Court envisioned when it stated that procuring discovery "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution." 517 U.S. at 468. The Supreme Court and the Tenth Circuit have explained that the "demanding" standard in place for

discovery "stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." 517 U.S. at 465; *Alcaraz-Arellano*, 441 F.3d at 1264 (adopting the reasoning in *Armstrong* for selective enforcement discovery). In asking this Court to exercise power over a "special province," *Armstrong*, 517 U.S. at 464, of the executive branch by ordering the massive production of NCIC reports from FBI-administered databases—to the extent that those databases may be impaired to serve their intended functions to law enforcement—Defendants ask this Court to overreach without sufficient evidence of either discriminatory intent or discriminatory effect to satisfy the Equal Protection Clause's requirements.

## CONCLUSION

Accordingly, for the reasons set forth in this Memorandum Opinion and Order, the United States' Sealed Motion to Reconsider (**Doc. 88**, filed 4/30/18), is **GRANTED IN PART** to the extent that the Court finds it was legal error for Judge Armijo to order discovery on the selective enforcement claim, but the Motion is **DENIED IN PART** in that the Court will not conduct a new evidentiary hearing on the selective enforcement claim. The Government's Motion is further **GRANTED IN PART** in that the Court finds that the Government has complied to the fullest extent possible with the discovery ordered by Judge Armijo regarding the selective enforcement claim.

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE